**THOMSON MACHINERY COMPANY,**
**Plaintiff**

v.

**Royal J. LAROSE, Edward P. Clause and Larose-Clause Company, Inc., Defendants and Third-Party Plaintiffs**

v.

**Byron C. THOMSON, Estival Aysen, Roland Clement, Ruby Thibodaux and Victor Wintz, Third-Party Defendants.**

**Civ. A. No. 7222.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 19, 1961.

Harvey Peltier, Donald L. Peltier, Thibodaux, La., Keith, Bolger, Isner & Byrne, W. D. Keith, New York City, Wilkinson, Mawhinney & Theibault, A. Robert Theibault, Washington, D. C., for plaintiff and for Byron C. Thomson, third-party defendant.

Deramee & Deramee, Edmond L. Deramee, Thibodaux, La., Garvey & Garvey, Bernard F. Garvey, Diggins & LeBlanc, Bartholomew A. Diggins, Washington, D. C., for defendants and third-party plaintiffs.

Robert D. Morvant, Thibodaux, La., for Estival Aysen, Roland Clement and Ruby Thibodaux, third-party defendants.

Borron, Owen, Borron & Delahaye, Paul G. Borron, Jr., Baton Rouge, La., for Victor Wintz, third-party defendant.

J. SKELLY WRIGHT, District Judge.

In this declaratory judgment[1] action plaintiff, Thomson Machinery Company of Thibodaux, Louisiana, asks to have declared invalid and non-infringed two patents relating to the harvesting of sugar cane. Since substantially all of the sugar cane grown in this country comes from a few parishes in south Louisiana, these patents operate in a very

1. 28 U.S.C. §§ 2201, 2202.

narrow compass and are of no general interest.

Sugar cane is a standing crop planted in rows usually spaced about six feet apart. The harvesting machines now in use cut and top one row at a time. These machines have great wheels, the treads of which run on the ground between the rows. In cutting a field of sugar cane, the harvester usually begins by cutting the second row from the ditch so that the sugar cane in that row falls in a leaning position against the first standing row. After making this initial cut, the harvester can then proceed to cut and pile the remaining rows in so-called "heap" rows, which are rows of cut sugar cane lying perpendicular to, and between, the cut standing rows. From the heap row the cane is conveyed from the field.

Prior to the patents in suit, it was the practice to gather the leaning row of cut cane by hand and place it on the heap row lying between the second, or leaning, row and the third row in the field. The patents here describe a means by which the leaning row is mechanically turned from its position against the standing uncut row onto the adjacent heap row while at the same time cutting the standing row.

Thomson Machinery Company manufactures substantially all of the sugar cane harvesters used in south Louisiana. The defendant, Larose-Clause Company, Inc., owned by the inventors of the patents in suit, Royal J. Larose and Edward P. Clause, is engaged in the business of servicing these harvesters as well as other sugar cane harvesting equipment in the area. For some years Thomson had sought to design and place on its harvester an attachment which would turn the leaning row of cut cane into the heap row. As late as 1954 Thomson had been working with one Wintz in an effort to design such an apparatus. In connection with this endeavor, Thomson experimented with various attachments similar to the one described in the apparatus patent in suit. Its efforts, however, were unavailing and in each instance the apparatus was cut from the harvester to which it had been attached and the parts thereof eventually used as salvage.

Some time in the spring of 1954 the defendants here were asked by one Campesi, a sugar cane farmer, to design an attachment for his Thomson harvester which would turn the leaning row of cut cane. After some experimentation, and with the help of an engineer named Oswald, formerly employed by Thomson but then employed by the inventors, such a device was designed and attached to Campesi's harvester. Its successful operation won immediate acceptance in the industry until finally, in 1956, Thomson began placing a device similar to the Larose-Clause apparatus on its own harvesters. It was this action on the part of Thomson which gave rise to this litigation.

The two patents in suit were originally included in one application. The inventors, defendants herein, were advised by the Patent Office that their application should be divided in two,[2] one describing a method for mechanically turning the leaning row of cut cane while in the same operation cutting the standing row, and the second, an apparatus patent, covering the turning machine itself. This was done and the two patents were issued in due course.[3]

The method patent has two claims,[4] the first of which merely outlines a meth-

2. See 35 U.S.C. § 121.

3. Method Patent No. 2,799,984, applied for November 23, 1954, issued July 23, 1957. Apparatus Patent No. 2,871,645, applied for November 23, 1954, issued February 3, 1959.

4. The two claims read:
   "1. A method of harvesting sugar cane comprising cutting an intermediate row of standing cane and permitting it to fall into a leaning position, supported by an adjacent row, after which rows of standing cane, in a direction opposite to the lean of the cut row, are successively cut and piled in a heap in one row, followed by mechanically raising the leaning cane row and gradually lifting and turning the cane of said row to a position where it will gravitate onto the heap row.
   "2. The method of claim 1 including the further step of cutting the said ad-

od of harvesting sugar cane by cutting an intermediate row of standing cane, permitting it to fall in a leaning position against the standing row, after which the rows of standing cane, in a direction opposite to the lean of the cut row, are successively cut and piled in heap rows, followed by mechanically raising the leaning cane row and gradually lifting and turning it to a position from which it will gravitate onto a heap row. The second claim of the method patent merely provides for the cutting of the standing row after the leaning row has been disengaged therefrom.

The process patent has four claims [5] describing an apparatus for mechanically lifting and turning cut stalks of sugar cane by employing a mobile supporting means, such as a harvester, adapted to be moved along a row of cane stalks. An elongated cane moving means, such as an endless chain, is mounted on the front of the harvester and is adapted to engage and move the cut cane upward and over onto the heap row to the right. The cane moving means has a forward lower end and an elevated rear end, which rear end is displaced laterally with respect to the path of the harvester. The turning of the cut cane clears a path for the movement of the harvester along the row of uncut cane on its left. Claim 2 merely substitutes the words "disposed diagonally" for "laterally displaced" in Claim 1. Claim 3 expands the function of the "kickers," or projections from the endless chain which engage the leaning cane, and

jacent row of cane after the leaning row has been disengaged therefrom."

5. The four claims read:

"1. A sugar cane lifting and turning device for cut stalks of cane, comprising a mobile supporting means, adapted to be moved along a row of cane stalks, an elongated cane moving means on said mobile supporting means adapted to engage and move cane stalks therealong, said moving means having a forward lower end and a rear elevated end, the said rear end being laterally displaced with respect to the normal line of movement of said supporting means, whereby cane stalks will be engaged and moved laterally to clear a path for movement of said mobile supporting means along a row of uncut stalks.

"2. A sugar can lifting and turning device for cut stalks of cane, comprising a mobile supporting means adapted to move along a row of cane stalks, a cane moving means on said mobile supporting means adapted to engage and move cut cane stalks therealong, said moving means being disposed diagonally to its path of travel having a forward lower end and a rear elevated end, the said rear end terminating laterally with respect to the normal line of movement of said supporting means whereby cane stalks will be engaged and moved laterally to clear a path for movement of said mobile supporting means along a row of uncut stalks.

"3. A sugar cane lifting and turning device as defined in claim 1 in which the cane moving means comprises cane en-gaging kickers movably mounted independently of said mobile supporting means and means for moving said kickers from the forward lower end to the rear elevated end of the cane moving means as the mobile supporting means is moved along a row of cane stalks.

"4. A sugar cane lifting and turning device as defined in claim 1 in which the cut stalks of cane to be turned are leaning transversely against a row of standing cane and in which the cut stalks are to be lifted and turned to a heap row, the heap row being parallel to said row of leaning cut stalks on the side opposite said standing stalks and the individual stalks in the heap row being transverse to the row, and in which the mobile supporting means comprises a harvester adapted to be moved along the standing row of cane stalks, in which the forward lower end of the cane moving means is positioned below said leaning stalks and adjacent to but laterally spaced from said standing cane stalks and in which said rear end of the cane moving means is laterally displaced to the normal line of movement of said harvester toward said heap row, said cane moving means including an endless chain having outwardly projecting kickers for engaging stalks of cut cane and means for driving said endless chain from said forward lower end to said rear elevated end of said cane moving means as the harvester moves along the standing row of cane whereby the cut stalks of cane are lifted from leaning position, turned and deposited on said heap row."

Claim 4 limits the invention to an apparatus for turning leaning rows of cut cane onto a heap row.

Thomson's main reliance here is on its allegations of invalidity, since there is little doubt that the claims of the patents read directly on the accused device. Thomson asserts many grounds for invalidity. First, it challenges the patents as lacking in invention. 35 U.S.C. § 103. As to the method patent, it is argued that mechanically doing, and in the same way, what was formerly done by hand is not invention. Nor does the apparatus patent describe an invention, according to Thomson, since it is merely an aggregation of elements old in the art which perform no new function. Thomson asserts that the apparatus in suit is nothing but a boom-mounted endless chain having projections which pick up the leaning cane and, as the chain moves rearward diagonal to the path of the harvester, pull the cane upward and turn it onto the heap row. Thomson maintains that these old elements perform no new function in the apparatus patent and, if they do, then the assembly of these old elements to perform this new function comes within the ordinary skill of the art exclusion of 35 U.S.C. § 103.

Thomson further maintains that the patents in suit were anticipated in the prior art, particularly by the work of Wintz in which it participated. 35 U.S. C. § 102(a). In support of this position it cites many patents, most of which were cited by the Patent Office in issuing the patent. In this connection, however, it rests most strongly on a patent for a snow plow [6] which was not cited by the patent examiner but which is in a non-analogous art. Further claims of invalidity advanced by Thomson allege that the defendants were not the inventors,[7] that Campesi was, and that in any event

the claims of the patents were in public use in this country more than one year prior to the date of the application. 35 U.S.C. § 102(b).

*I*

The elusive concept of invention stands at the threshhold of every patent application. Unless it tends "To promote the Progress of Science and useful Arts," it does not meet the standard of invention set up in the Constitution itself. U.S. Const. Art. 1, § 8, cl. 8. There seems to be some difference of opinion as to whether the Congress or the Supreme Court is the final authority on this constitutional standard. After the Supreme Court enunciated the "flash of creative genius" test in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58, Congress defined its own standard of patentability, adopting the "ordinary skill in the art" test on which many courts had previously relied.[8] 35 U.S.C. § 103. Since the Congressional standard has been promulgated, courts more or less have sought to apply it rather than require the "flash of creative genius" as the primary ingredient of invention.[9]

To say that the Congressional test is a definitive one is to misunderstand the fugitive nature of the concept of invention. "The truth is the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not." McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 78, 35 L.Ed. 800. Moreover, "Invention is not always the offspring of genius; more frequently it is the product of plain hard work; not infrequently it arises from accident or carelessness; occasionally it is a happy thought of an ordinary mind; and there have been instances where it is the result of sheer

6. Issued to A. E. Schmechel, No. 2,768,454.

7. 35 U.S.C. § 102(f).

8. See Seismograph Service Corp. v. Offshore Raydist, D.C.E.D.La., 135 F.Supp. 342, and cases cited in Note 6 on page 350.

9. Emerson v. National Cylinder Gas Company, 1 Cir., 251 F.2d 152; Fisch v. Gould, 3 Cir., 246 F.2d 5; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530. But see Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154, 71 S.Ct. 127, 95 L.Ed. 162.

stupidity. It is with the inventive concept, the thing achieved, not with the manner of its achievement or the quality of the mind which gave it birth, that the patent law concerns itself." Radiator Specialty Co. v. Buhot, 3 Cir., 39 F.2d 373, 376.

The presumption of validity attends the grant of a patent, and the burden of persuasion of invalidity is on the putative infringer. Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453; 35 U.S.C. § 282. This presumption is strengthened where it appears the Patent Office has considered and distinguished prior art relied on as anticipation. Southern States Equip. Corp. v. USCO Power Equip. Corp., 5 Cir., 209 F.2d 111. A felt need for, acceptance and utility of, a process or device is evidence of its patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. A process, or method, patent is one which outlines a procedure for producing a physical result independent of the producing mechanism. Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980. A separate patent may be obtained on the producing mechanism provided it rises to the stature of invention. To be patentable, it is not necessary that the method or machine be broadly or generically new. For example, a combination of elements old in the art, like the apparatus in suit, may be patentable if the result produced is new and unexpected. Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805; Jeoffroy Mfg. v. Graham, 5 Cir., 219 F.2d 511; Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783.

Since the award of a patent is tantamount to a seventeen-year monopoly, applications for patents should be closely scrutinized to make certain that favorable action thereon will not withdraw from the public domain that which men skilled in the art have a right to use without permission and without the payment of tribute. This principle is basic to the consideration of every patent application. "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention." Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438.[10]

As to combination patents, the Supreme Court stated the principle thusly: "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. 152–153, 71 S.Ct. 130.

10. See also, concurring opinion of Mr. Justice Douglas in Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. 154, 71 S.Ct. 131: "Every patent is the grant of a privilege of exacting tolls from the public. The Framers plainly did not want those monopolies freely granted. The invention, to justify a patent, had to serve the ends of science— to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge."

## II. The Method Patent

The method patent is invalid for want of invention. Neither claim in the patent can successfully stand the test of patentability. The method patent simply describes a process for harvesting sugar cane. But the method described is basically the same as that which has been in use in the industry since 1938 when harvesters replaced manual labor in the cane fields. Since that time it has been the practice, on entering a cane field for harvesting, to cut an intermediate row of cane so that it leans against the adjoining row, after which the harvester proceeds to cut, top and, since 1945, pile the remaining cane in the field into heap rows.

It is true that the method patent in suit, in describing its claims as well as its specifications, substitutes "mechanically raising the leaning cane row and gradually lifting and turning the cane of said row to a position where it will gravitate onto the heap row" for the manual method of doing the same thing which was prevalent in the industry at the time of the patent application in suit. The patent does not describe the mechanical device used. It merely states that what heretofore was done manually the patent would do mechanically. But suggesting the thought or idea of doing machanically what has been done manually is not invention.[11] And this is true in spite of the fact that it was the Patent Office itself which advised the applicants here that their original application covered two patents and suggested that there be a second application for a method patent in addition to the application for the apparatus or machine patent. Perhaps the Patent Office did not know, as competent patent counsel preparing the orig-inal application apparently knew, that the other steps in the method for harvesting cane described in the patent were old in the industry and that the only point of novelty in the operation suggested by the application was the substitution of mechanical means for manual means.

An idea or concept is not patentable, and the idea of substituting a mechanical means for manual means likewise is not patentable.[12] Hence, the method patent fails on the only point of novelty it presents. Moreover, the idea of placing the leaning row of cane onto the heap row mechanically was not original with the applicants for the patent. Others in the field, including the plaintiffs here, were trying to perfect a mechanical means for turning the leaning row long before Campesi came to Larose and Clause and asked them to design such a device for attachment to his Thomson harvester.

To validate this method patent would be to jeopardize the right of sugar cane farmers to harvest their crops as they have for years. The recognition of this patent would withdraw "what already is known into the field of its monopoly and diminish the resources available to skillful men." Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. 152–153, 71 S.Ct. 130.

## III. The Apparatus Patent

The first three claims of the apparatus patent are invalid. These claims broadly describe a device to be attached to the front end of a harvester which would lift and turn cut stalks of sugar cane. The elements of this device admittedly are all old in the art. In addition, several prior patents, cited by the Patent Office, have been issued covering devices composed of similar elements which, when attached to a harvester, would

11. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L. Ed. 3; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 44 S.Ct. 346, 68 L.Ed. 708; Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899; Marchand v. Emken,

132 U.S. 195, 10 S.Ct. 65, 33 L.Ed. 332; Corning et al. v. Burden, 15 How. 252, 56 U.S. 252, 14 L.Ed. 683; Cornell v. Chase Brass & Copper Co., 2 Cir., 142 F.2d 157; Jones v. General Fireproofing Co., 6 Cir., 254 F. 97.

12. See cases cited in Note 11.

gather stalks of sugar cane, both cut and uncut. In particular, the Gray patent, No. 1,956,676, issued May 1, 1934, describes a similar device, the claims of which read very closely on the defendants' device as well as on the first three claims of the defendants' apparatus patent. For the reasons stated in invalidating the claims of the method patent, it would be wrong to recognize as invention the claims for a device which perform the same or similar function in more or less the same way as devices already appearing in the prior art.

At the same time, unquestionably the defendants' device, as described in Claim 4 of the apparatus patent as one for turning the leaning row of cut cane, definitely filled a felt need in the industry. The industry's largest manufacturer of harvesting equipment, the plaintiff here, recognized this need and tried unsuccessfully to fill it. It is true that Thomson's experiments with Wintz produced a device which was very close in design to the apparatus in suit. But the Wintz device did not work. It was cut off the harvester and the parts thereof used as salvage. Defendants' device did work. It was accepted by the industry. Defendants added the last step toward success in designing a device which would turn the leaning row. And it is the last step which makes the invention and gives the inventor the right to a patent.[13]

Thomson's charge that the defendants made no contribution to the art, that the last step which perfected their device was one which was obvious to a person having ordinary skill in the art, comes in bad grace. Thomson had been unsuccessful in perfecting a turner. When defendants' turner operated successfully

and began to receive acceptance from the industry, Thomson hired back defendants' engineer, Oswald, who had assisted defendants in the design of the turner, and had Oswald assist Thomson in designing a facsimile. Conscious imitation is the sincerest form of flattery. It is likewise proof positive here that the defendants had succeeded in designing a turning device, a success which had eluded Thomson.

Claim 4 of the apparatus patent is valid because, unlike Claims 1, 2, and 3, it is limited to a device which turns the leaning row of cut cane. This is the novelty in the invention. This is its only novelty. Therefore, the claim of the invention should be limited to it.

### IV. Infringement

█ As indicated, Thomson's position in this litigation is that the patents in suit are invalid. It makes no real defense to the charge of infringement. Actually, it admits that Claim 4 of the apparatus patent reads on the accused device. The elements of each are the same and there is an identity of function, result and mode of operation.[14] This is infringement.

The only defense asserted as to infringement seems to be with reference to the interpretation of the words "lifting and turning" in the claim. Thomson admits that if the words in the patent "lifting and turning" are given their commonly accepted meaning, then they read on the accused device. Since there appears no reason to give these words any other meaning, the interpretation defense to infringement must likewise fail.

Judgment accordingly.

13. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co. (The Barbed Wire Patent) 143 U.S. 275, 282, 12 S. Ct. 443, 36 L.Ed. 154.

14. See Electric Protection Co. v. American Bank Protection Co., 8 Cir., 184 F. 916, 923, and cases there cited.